FILED

Margaret Botkins
Clerk of Court

3:08 pm, 1/19/23

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

CAROLYN ROSEMARY DOMANOSKI, personal representative of the Estate of Franklin Allen Ross, deceased,

    Plaintiff,

VS.

JOHNNY M. TOOKE, MD,

LT. ERNADINE NICHOLS,

KARLA UNDERWOOD, RN,

ANGELA CHESSER, LPN,

DEBORAH POPPE, LPN.

    Defendants,

Case No.  20-CV-00107-ABJ

## ORDER DENYING DEFENDANT TOOKE'S MOTION FOR SUMMARY JUDGMENT [ECF 103]

This matter is before the Court on Plaintiff's civil rights complaint pursuant to 42 U.S.C. §§ 1983 & 1988 [ECF 87] and Defendant Johnny M. Tooke's Motion for Summary Judgment [ECF 103]. The Court, having reviewed the motion, response, reply and being otherwise fully advised, concludes that Defendant Tooke's Motion to for Summary Judgment should be DENIED.

1

## BACKGROUND

The undisputed facts are as follows. Mr. Allen was diagnosed with bladder cancer in April of 2017 and voluntarily discontinued treatment before achieving remission. [ECF 104 p. 3] On January 7, 2020, Mr. Allen was booked into the Natrona County Detention Center (NCDC). [ECF 104 p. 3] On January 9, 2020, Dr. Tooke and Nurse Chesser performed a physical examination on Mr. Allen where they learned he had a history of bladder cancer and was under the care of Dr. Brandon Trojan. [ECF 104 p. 3] Dr. Tooke informed Mr. Allen that he would leave his care to his cancer doctors and ordered a follow-up appointment with Mr. Allen's urologist, Dr. Trojan. [ECF 104 p. 4] Mr. Allen saw Dr. Trojan on February 5, 2020. [ECF 104 p.4] Mr. Allen continued to refuse conventional treatment and his main complaint was pain in his right hip where he had a known metastatic lesion. [ECF 113 p. 11] Dr. Trojan planned a routine follow-up for four months. [ECF 104 p. 4]

Inmates at the NCDC were permitted to file medical request forms, known as "kites." [ECF 104 p. 5] Nurses responded to requests that fell within their realm and referred anything they could not help with to Dr. Tooke or Lieutenant Nichols. [ECF 104 p. 4] When nurses felt inmates needed to see a doctor they were placed on "sick call." [ECF 104 p. 5] Mr. Allen was permitted to file medical kites despite Dr. Tooke's understanding that Dr. Trojan was handling Mr. Allen's care. [ECF 104 p. 5] Dr. Tooke visited the jail multiple times a week and saw patients who had requested to see him and who the nurses placed on "sick call." [ECF 104 p. 5]

Starting on April 1, 2020, Mr. Allen complained daily about pain in his right hip. [ECF 104 p. 5] He specifically asked to see a doctor: "Could I please see a doctor about my right hip. It is hurting all the time and I can't even sit on it for very long cuz (sic) of the pain." [ECF 4 p. 5; ECF 104 ex. 6 p. 7] Nurse Chesser reviewed his kite and determined he did not need to see a doctor and prescribed Naprosyn for two weeks. She forwarded the prescription to Dr. Tooke who reviewed and approved it. [ECF 104 p. 5]

On April 17, 2020, Mr. Allen submitted a medical request form for pain in his right flank. The nurse checked his vitals and performed a urinalysis. The urinalysis came back positive for a urinary tract infection. [ECF 104 p. 6] Dr. Tooke prescribed Mr. Allen an antibiotic to treat the urinary tract infection. [ECF 104 p. 6]

On either April 25, 2020, Mr. Allen submitted a kite complaining of pain in his right hip. [ECF 104 p. 6] It stated: "My right hip is hurting really bad. I can't sit or put any pressure on it getting harder to walk. Can I please see a doctor. Also been feeling sick lately from my cancer. Also right kidney is hurting." [ECF 104 p. 6; ECF 104, ex. 6 p. 5] Nurse Forbes addressed the request the next day and placed Mr. Allen on the sick call list to see a physician. [ECF 104 pp. 6-7] Mr. Allen did not see Dr. Tooke. [ECF 113 p. 14]

Mr. Allen filed another kite on April 30, 2020. [ECF 104 p. 7] The kite said: "I'm in extreme pain. My right side pelvic area hurts so but I can hardly walk. Also pain has started shooting down right leg. I weighed myself the other day 181. I was 220 6 months ago when I started my incarceration." [ECF 104 p. 7; ECF 104 ex 6 p. 4] Nurse Chesser

3

handled the kite, noted his weight was 198 when he was admitted to the NCDC, informed him weight can fluctuate, offered him the opportunity to weigh himself when he went into nursing that day, and told him they told Dr. Trojan's office about his concerns and they would be addressed at his next appointment. [ECF 104 p. 7]

On May 1, 2020, that Mr. Allen was transported to the Wyoming Medical Center (WMC) because of his pain. [ECF 104 p. 14] The staff at WMC performed a CT scan and discovered "significant progress of his disease." [ECF 113 p. 15] After Mr. Allen returned from the hospital, Dr. Tooke prescribed narcotic pain medication until his release from the NCDC in mid-July 2020. [ECF 113 p. 16]

## *STANDARD OF REVIEW*

Defendant Tooke asserts he is entitled to qualified immunity. "Qualified immunity protects officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Individual defendants named in a § 1983 lawsuit may raise a defense of qualified immunity." *Rowell v. Board County Commissioners of Muskogee County, Oklahoma*, 978 F.3d 1165, 1171 (10th Cir. 2020) (quoting *Henderson v. Glanz*, 813 F.3d 938, 951 (10th Cir. 2015)). "Because qualified immunity is 'an immunity from suit rather than a mere defense to liability,'" the Supreme Court has "repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231-32 (internal quotations omitted).

When a defendant moves for summary judgment based on qualified immunity, the burden is on the plaintiff to show "(1) a violation of a constitutional right; and (2) that the constitutional right was clearly established at the time of the violation." *Burke v. Regalado*, 935 F.3d 960, 1002 (10th Cir. 2019) (quoting *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 877 (10th Cir. 2014)). To show that a law was clearly established, "the plaintiff must point to Supreme Court or Tenth Circuit precedents [o]n point, or to the clear weight of authority from other circuit courts deciding that the law was as the plaintiff maintains." *Thompson v. Ragland*, 23 F.4th 1252, 1255 (10th Cir. 2022). "When the record shows an unresolved dispute of historical fact relevant to this immunity analysis, a motion for summary judgment based on qualified immunity should be properly denied." *Paugh v. Uintah County*, 47 F.4th 1139, 1153 (10th Cir. 2022) (quoting *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1212 (10th Cir. 2002)) (internal quotations omitted).

"If a 'plaintiff successfully carries his two-part burden,' the 'defendant bears the burden, as an ordinary movant for summary judgment.'" *Henderson*, 813 F.3d at 952 (quoting *Mick v. Brewer*, 76 F.3d 1127, 1134 (10th Cir. 1996)). Summary judgment is appropriate when "the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit." *Rowell*, 978 F.3d at 1171 (quoting *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014)). The Court views "the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party." *Id.*

5

(quoting *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 997 (10th Cir. 2011)). "When the defendant has moved for summary judgment based on qualified immunity, we still view the facts in the light most favorable to the non-moving party and resolve all factual disputes and reasonable inferences in its favor." *Henderson*, 813 F.3d at 952.

## DISCUSSION

### I. Dr. Tooke— 42 U.S.C. § 1983 Eighth Amendment

#### A. Defendant Tooke's Motion for Summary Judgment [ECF 103]

Defendant, Johnny M. Tooke, MD, moved this Court for Summary Judgment and asserts he is entitled to qualified immunity. [ECF 103] Defendant Tooke emphasizes that Mr. Allen's estate brought a survivor action pursuant to Wyoming Statute § 1-1-104 to recover damages that survived his death—specifically the pain and suffering he endured during April and May of 2020. [ECF 104 p. 3] Dr. Tooke argues he is entitled to judgment as a matter of law on this claim because he is entitled to qualified immunity and Ms. Domanoski cannot prove deliberate indifference. [ECF 104 p. 3]

Dr. Tooke argues that Plaintiff's claim that he was "practically absent" from Mr. Allen's care in April and May of 2020 was "utterly disproven by discovery." [ECF 104 p. 11] He claims the evidence shows the NCDC staff and Dr. Tooke timely addressed every one of Mr. Allen's complaints. [ECF 104 p. 11] Dr. Tooke contends he is entitled to qualified immunity because there is no identifiable conduct on his part that qualifies as deliberate indifference. [ECF 104 p. 12] He argues the assertion he was absent from Mr. Allen's care is conclusory, devoid of factual content, and contrary to the record. [ECF

6

104 p. 12] He further argues Mr. Allen's complaints were consistently addressed by medical providers and therefore there is no evidence of an objective deprivation of his rights. [ECF 104 p. 14]

Dr. Tooke also argues Plaintiff cannot prove the subjective prong of the deliberate indifference test. [ECF 104 pp. 14-15] He contends Mr. Allen had discontinued traditional cancer treatment prior to incarceration at the NCDC and all that was left was to treat Mr. Allen's pain, which NCDC medical staff did through medication and other modalities. [ECF 104 p. 15] Dr. Tooke argues Plaintiff's argument, at most, asserts a disagreement over a course of treatment and therefore cannot support a deliberate indifference claim. [ECF 104 p. 17]

### B. Plaintiff's Response to Motion for Summary Judgment [ECF 113]

In response, Plaintiff argues Dr. Tooke is not entitled to Qualified Immunity. She contends Mr. Allen complained of severe pain in his hip every day in April and never saw or heard from Dr. Tooke. [ECF 113 pp. 2; 14 n. 10] She argues the evidence shows Dr. Tooke was deliberately indifferent to Mr. Allen's pain during the month of April. [ECF 113 p. 22] Plaintiff argues Dr. Tooke's failure to follow the NCDC's policies provides circumstantial evidence that Dr. Tooke consciously disregarded a substantial risk of harm. [ECF 113 p. 21] Plaintiff argues Dr. Tooke approved the policies which required: chronic care protocols, individualized treatment plans with long-and short-term goals, regular clinic visits and evaluations by the physician, regular physician review of the patient's history and progress to optimize the treatment plan. [ECF 113 p. 23] Plaintiff argues none of these policies were followed in Mr. Allen's case. [ECF 113 p. 23]

### C. Defendant Tooke's Reply Brief [ECF 115]

In his reply brief, Dr. Tooke argues that the "real" issue in this case is whether Mr. Allen actually complained of uncontrollable pain related to metastatic cancer, and whether Dr. Tooke ignored his complaints. [ECF 115 p. 2] Dr. Tooke asserts Plaintiff failed to establish that Mr. Allen suffered from uncontrollable pain. [ECF 115 p. 2] He further argues that Dr. Tooke and the NCDC staff addressed every one of Mr. Allen's complaints. [ECF 115 pp. 2-3]

### D. Qualified Immunity

"There is little doubt that deliberate indifference to an inmate's serious medical need is a clearly established constitutional right." *Mata v. Saiz*, 427 F.3d 745, 749 (10th Cir. 2005). The Tenth Circuit has held that "it is 'clearly established that when a detainee has obvious and serious medical needs, ignoring those needs necessarily violates the detainee's constitutional rights." *Paugh*, 47 F.4th at 1167 (quoting *Quintana v. Santa Fe County Board of Commissioners*, 973 F.3d 1022, 1033 (10th Cir. 2020)). The Tenth Circuit has previously held that denying medical attention to inmates in severe pain can constitute deliberate indifference. *Al-Turki v. Robinson*, 762 F.3d 1188, 1195 (10th Cir. 2014), *Mata*, 427 F.3d at 755, *Sealock v. Colorado*, 218 F.3d 1205 1210 (10th Cir. 2000). "The relevant inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Thus there need not be 'a case directly on point for a right to be clearly established." *Paugh*, 47 F.4th at 1169. Here, the law was clearly established that the

8

failure to provide medical care for Mr. Allen's severe pain could amount to a constitutional violation.

### E. Deliberate Indifference Standard

Because Plaintiff has demonstrated that the law was clearly established at the time of the violation, the Court moves to the second prong of the qualified immunity test. To state a deliberate indifference[1] claim, "a plaintiff must allege that an official acted (or failed to act) in an objectively unreasonable manner and with subjective awareness of the risk." *Strain v. Regalado*, 977 F.3d 984, 987 (10th Cir. 2020). The objective piece requires the plaintiff to establish that the alleged deprivation is "'sufficiently serious' to constitute a deprivation of constitutional dimension." *Id.* at 989-90 (quoting *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006)). The plaintiff can prove the "'medical need is [objectively] serious if it is one that has been diagnosed by a physician as mandating treatment or that is so obvious that even a lay person would easily recognize the necessity for doctor's attention.'" *Id.* at 990 (quoting *Clark v. Colbert*, 895 F.3d 1258, 1267 (10th Cir. 2018) (alterations in original)).

To prove the subjective component, the plaintiff must "establish that a medical 'official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Id.* (quoting *Mata*, 427 F.3d at 751 (modifications omitted)). "A prison medical professional who serves 'solely

---

[1] Plaintiff asserts Defendants violated the Eighth Amendment. [ECF 87 p. 13] In his original, pro se, complaint, Mr. Allen described himself as a pretrial detainee. [ECF 1] The Fourteenth Amendment, not the Eighth, "prohibits deliberate indifference to a pretrial detainee's serious medical needs." *Strain*, 977 F.3d at 897. The deliberate indifference standard is the same under both amendments, *id.* at 989, and neither party raised this error.

9

. . . as a gatekeeper for other medical personnel capable of treating the condition' may be held liable under the deliberate indifference standard if she 'delays or refuses to fulfill that gatekeeper role.'" *Mata*, 427 F.3d at 752 (quoting *Sealock,* 218 F.3d at 1211).

Under the deliberate indifference standard, "the negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional claim." *Crum*, 439 F.3d at 1231. If "a medical professional provides a level of care consistent with the symptoms presented by the inmate, absent evidence of actual knowledge or recklessness, the requisite state of mind cannot be met." *Id.* at 1233. "[A] prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation." *Crum*, 439 F.3d at 1231 (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1277, n. 7 (10th Cir. 2001)).

### F. Deliberate Indifference Analysis

Simply put, the issue is whether Dr. Tooke was deliberately indifferent to Mr. Allen's severe pain during the month of April. The Tenth Circuit has held "that the substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Al-Turki*, 762 F.3d at 1193 (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)). "The point of the objective prong of the deliberate indifference test is to 'limit claims to significant, as opposed to trivial suffering.'" *Id.* at 1193 (quoting *Mata*, 426 F.3d at 753).

<u>1. Objective Component</u>

Dr. Tooke argues Plaintiff cannot establish the objective component because there was no deprivation—"the record reveals Dr. Tooke and/or staff at NCDC addressed the

10

Plaintiff's medical needs at every stage." [ECF 104 p. 13] However, as Dr. Tooke points out, the Court looks to Dr. Tooke's actions or inactions in relation to Mr. Allen to determine if he is entitled to qualified immunity—not the collective actions of the NCDC staff. *See Mata*, 427 F.3d at 756 ("The fact that Ms. Mata was 'assessed' by another nurse the morning after she sought medical attention from Ms. Weldon is irrelevant to Ms. Mata's cause of action against Ms. Weldon.") Dr. Tooke points to the initial intake examination, the referral for a CT to evaluate the status of the cancer, and the fact he scheduled an appointment for Mr. Allen to see his urologist at the beginning of February to show he was not deliberately indifferent to Mr. Allen's serious medical needs. [ECF 104 p. 13] However, Dr. Tooke's actions at the beginning of Mr. Allen's incarceration at the NCDC are not at issue. The question for this Court is whether Dr. Tooke's actions or inaction during the month of April constituted deliberate indifference.

As in, *Oxendine* Dr. Tooke believes it is dispositive that Mr. Allen was prescribed "numerous modalities including pain medication," when Mr. Allen first complained of pain on April 1, 2020, and that he prescribed an antibiotic for Mr. Allen's urinary tract infection (UTI) on April 17, 2020. *Oxendine*, 241 F.3d at 1277, n. 7 ("The government seems to find dispositive the fact that Oxendine received at least some treatment from Dr. Kaplan during the time period when he alleged that he received inadequate and delayed medical care."); [ECF 104 pp. 13-14] However, there is a genuine question of material fact about what Dr. Tooke was involved in prescribing on April 1, 2020. It is uncontested he signed off on Nurse Chesser's prescription for the over-the-counter pain

11

reliever, Naprosyn. It is unclear whether he was involved with Nurse Chesser's further recommendation for "pillow positioning and yoga stretches." [ECF 104 ex F p. 7]

Further, Dr. Tooke argues Mr. Allen admitted "Dr. Tooke's [UTI] diagnosis was correct and the antibiotics prescribed by Dr. Tooke relieved his symptoms." [ECF 104 p. 6] However, Mr. Allen's deposition clearly states the antibiotics eliminated the UTI symptoms, but the cancer related pain Mr. Allen experienced was different than the pain he experienced from the UTI:

> Q Did you relay to the nurses that you were having these pain issues?
>
> A Daily
> . . .
>
> Q [defense lawyer] Is this pain different than the pain you experienced from a UTI?
>
> A Yes.

[ECF 104 ex. 1 p. 103:4-22]

> Q Is it true that prior to this emergency department visit on May 1st, that while in the Natrona County Detention Center, you had been diagnosed with a urinary tract infection?
>
> A I believe so.
>
> Q And you were treated with antibiotics, correct?
>
> A Correct.
>
> Q And those antibiotics that you were treated with helped to resolve the symptoms you experienced *related to the urinary tract infection, true*?
>
> A True

[ECF 104 ex. 1 p. 162:25-163:12 (emphasis added)] The defense attorney asked Mr. Allen twice more if the antibiotic Bactrim relieved his urinary tract infection symptoms and Mr. Allen stated they did. [ECF 104 ex. 1 p. 170:8-11; 171:4-10] However, Mr. Allen was unequivocal that the pain in his hip from his cancer was different than the pain from his UTI. The fact that Dr. Tooke prescribed Bactrim for a UTI, without seeing Mr. Allen, does not demonstrate that Dr. Tooke was not deliberately indifferent to Mr. Allen's serious medical needs related to the pain caused by his metastatic cancer. This case does not involve a "mere disagreement between parties" about the course of treatment. *Oxendine*, 241 F.3d at 1227 n. 7 (quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1223-24 (10th Cir. 1999).

Here, there is no question that Mr. Allen's metastatic bladder cancer and the pain caused by it constitute an objectively serious medical need. Plaintiff has satisfied the objective component.

2. Subjective Component

The Supreme Court has held that delaying access to medical care can constitute deliberate indifference. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). "A prisoner may satisfy the subjective component by showing that defendants' delay in providing medical treatment caused either unnecessary pain or a worsening of her condition." *Mata*, 426 F.3d at 755. Plaintiffs can demonstrate the subjective component "through circumstantial evidence." *Id.* at 752.

Plaintiff argues Dr. Tooke failed to follow the Natrona County Detention Center's policies in Mr. Allen's case. [ECF 113 p. 2] "While published requirements for health

care do not create constitutional rights, such protocols certainly provide circumstantial evidence that a prison health care gatekeeper knew of a substantial risk of serious harm." *Mata*, 427 F.3d at 457. Here, the policies manual for medical services included policies for "Continuity and Coordination of Care" [ECF 113 ex. 8 pp. 182-83], "Chronic Disease Services" [ECF 113 ex. 8, pp. 193- 94], "Patients with Special Health Needs" [ECF 113 ex. 8 pp. 195-96], and "Care for the Terminally Ill" [ECF 113 ex. 8 pp. 226-27]. Dr. Tooke approved each of the policies and understood they applied to him. [ECF 113 ex. 5 p. 27:10-22]

The policies required Dr. Tooke to "ensure continuity of care from admission to discharge." [ECF 113 ex. 8 p. 182] They also required the "Responsible Health Authority Physician," Dr. Tooke, to "over-see the health care delivery system of the detention center." [ECF 113 ex. 8 p. 20] It states that "[c]linical judgement rests with a single, designated, licensed, responsible physician." [ECF 113 ex. 8 p. 20] The procedure for the responsible health authority states:

> The designated responsible health authority will be onsite at the Natrona County Detention Center at the minimum of once a week to review the health care delivery system provided by the nursing/medical division of the Natrona County Sheriff's Department. The health authority will arrange for all levels of health care and assures quality, accessibility, and timely health services for inmates.

[ECF 113 ex 8 p. 20]

The "Chronic Disease Services" policy states:

> The patient with a chronic disease will have regular clinic visits for evaluation and management by (sic) health care practitioner. The patient's history and progress will be

14

> reviewed on a regular basis to optimize the treatment plan. The patient will be provided patient education, monitoring and environmental control. The responsible health authority will assist in developing chronic care protocols addressing total disease management.

[ECF 113 ex 8 p. 193] The policy also required Dr. Tooke to, among other things, "implement a chronic disease program to incorporate a treatment plan and regular clinic visits. The physician will monitor the patient's progress and will include patient education for symptom management." [ECF 113 ex 8 p. 194]

The "Patients with Special Health Needs" policy required individualized treatment plans, developed by the detention center health authority (Dr. Tooke) and nursing staff, for inmates with a variety of enumerated diseases and "other chronic or convalescent conditions." [ECF 113 ex. 8 p. 195] The treatment plan should "consist of the course of treatment, statement of long and short term goals, provision for access to supportive and rehabilitative services as needed and regular medical follow up as needed." [ECF 113 ex. 8 p. 195]

Finally, the "Care for the Terminally Ill" policy states that terminally ill inmates "will be provided for in a supportive environment, in dignity, without pain, and in the company of family and//or friends if possible." [ECF 113 ex. 8 p. 226] While Plaintiff asserts this policy applies in Mr. Allen's case, and that Mr. Allen was terminally ill when he entered the Natrona County Detention Center, the policy itself defines "terminally ill" as an inmate who has been given a diagnosis with "less than one year to live." [ECF 113 ex. 8 p. 226] While everyone agrees Mr. Allen had cancer and had voluntarily discontinued treatment for his cancer, there is a question about whether he he had been

told he had less than a year to live as of April 2020. Therefore, there is a question of fact about whether the terminally ill patient policy applied to Mr. Allen.

In addition to the policy requiring Dr. Tooke to, "arrange for all levels of health care," [ECF 113 ex. 8 p. 20], the nursing defendants testified that it was Dr. Tooke's responsibility to refer inmates for outside medical care. Nurse Zubatch testified she did not have the authority to refer to an outside physician and that all outside referrals went through Dr. Tooke, even in Mr. Allen's case where multiple doctors were involved in his care. [ECF 113 ex. 6 pp 39:14-41:25] Lieutenant Nichols similarly testified:

> Q. Okay. You would agree that for Mr. Allen to have seen Dr. Trojan during the month of April, there would have needed to have been some sort of directive from Dr. Tooke, correct?
>
> A. Well, if he wrote something in April, which I have not seen anything in the chart unless I missed it, we would have done it. If—if Dr. Tooke said to take him in April, we would have done it.
>
> Q. Okay. And for patients like Mr. Allen who are at the jail, if they have metastasized cancer that is causing pain, the person that gets to decide whether they get to see a physician outside the jail is Dr. Tooke; is that right?
>
> A. Yes.

[ECF 113 ex. 2 p. 48: 8-22] Dr. Tooke testified he did not know who at the detention center, apart from himself, could refer patients for outside medical care. [ECF 113 ex. 1 pp 84: 25-85:3] Thus, there is a question of fact about whether Dr. Tooke was the only person at the Natrona County Detention Center who could refer patients for outside treatment.

16

At his deposition, Dr. Tooke admitted he knew about Mr. Allen's metastatic cancer and stated he only saw Mr. Allen one time. [ECF 113 ex. 1 pp. 54:6-19] Dr. Tooke then described the conversation that occurred at his only meeting with Mr. Allen:

> He told me he had bladder cancer, and it seems like he may have said there was – that it was severe. And then I said that I was a family practitioner and did not take care of patients with that degree of difficulty and for that reason, I was going to not have much to do with his care while he was in the jail and would leave that up to the—to his cancer doctor.

[ECF 113 ex. 1 pp. 60:21-61:3]

Dr. Tooke did not see Mr. Allen again after the initial visit. [ECF 113 ex. 1 pp. 83:20-84:6]. He also did nothing to ensure Mr. Allen had access to the doctor to whom Dr. Tooke entrusted his care:

> Q. What kind of steps did you take to make sure that Mr. Allen had direct access to Dr. Trojan after that jail meeting?
>
> A. None.

[ECF 113 ex. 1 p. 95:22-25] Nor did Dr. Tooke arrange for Mr. Allen to see his urologist when he became aware of Mr. Allen's worsening pain:

> Q. And he [Mr. Allen] writes: "Could I please see a doctor about my right hip. It is hurting all the time, and I can't even sit on it for very long because of the pain"; do you see that?
>
> A. Yes.
>
> Q. And I think you've testified earlier that you were contacted about this, correct?
>
> A. I was.
>
> Q. But you didn't see Mr. Allen?

17

> A. Correct.
>
> Q. And you didn't in any way follow up to see if he was being seen by Dr. Trojan about this hip pain, did you?
>
> A. Initially, when I saw – when I referred him to Dr. Trojan in January, I assumed that he continues to see—he's not—he's never been declared free of cancer. So his relationship with Dr. Trojan as taking care of this patient has always been assumed by me to be ongoing.

[ECF 113 ex 1 p. 96:12- 97:5]

Dr. Tooke repeatedly stated he was aware of Mr. Allen's condition, but disavowed responsibility related to Mr. Allen's cancer and associated pain. He further testified he left the cancer related treatment to Dr. Trojan and admitted he did not make it clear to all the nurses that they were to contact Dr. Trojan with Mr. Allen's complaints. He testified that after the initial visit he did nothing to ensure Dr. Trojan was treating Mr. Allen:

> Q. You had a patient with metastatic disease, right?
>
> A. No. Dr. Trojan had a patient with metastatic disease.
>
> Q. But he was your patient too, wasn't he?
>
> A. Not—not in the context I've been trying to tell you. No these are not my patients. I am helping. But he is, I guess[] he is my patient in the care of another physician.
>
> Q. He is also in your care, right?
>
> A. Not in relationship to cancer.
>
> Q. And did your nurses all know that you weren't responsible for any of his cancer care?
>
> A. I believe they did.
>
> . . .

18

> [DR. TOOKE]: There's 13 nurses. I didn't specifically go to every nurse and say: "I'm not—" "I'm not going to take care of his cancer." I indicated it to one or two nurses and assumed that it was relayed to everyone.
>
> . . .
>
> Q. What did you to do see what Dr. Trojan was doing about his pain?
>
> A. Nothing.

[ECF 113 ex. 1 pp. 108:23-110:1]

"An inmate 'need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act *despite his knowledge of* a *substantial risk* of serious harm.'" *Mata*, 427 F.3d at 752 (quoting *Farmer v. Brennan,* 511 U.S. 825, 842 (1994) (emphasis added). As discussed above, Plaintiff presented evidence that Dr. Tooke knew Mr. Allen had metastatic bladder cancer that spread to his hip. He also knew metastatic cancer could cause pain for the patient. [ECF 113 ex. 1 p. 28:14-22] Dr. Tooke assumed, but never verified, that Dr. Trojan was caring for Mr. Allen. [ECF 113 ex. 1 pp 85: 23-86:4; 96: 22-97:5; 106:8-18; 109: 16-20] Plaintiff further presented evidence showing that Dr. Tooke determined upon Mr. Allen's intake at the Natrona County Detention Center that he would not be responsible for any care related to Mr. Allen's cancer [ECF 113 ex. 1 pp. 60:21-61:3], that Mr. Allen complained of pain daily [ECF 104 ex. 1 p. 103:4-22], that Dr. Tooke knew of the pain but declined to see Mr. Allen and removed him from the sick call list, [ECF 113 ex. 1 p. 95:5-21] that only Dr. Tooke could make referrals to outside providers

[ECF 113 ex. 6 pp 39:14-41:25; ECF 113 ex. 2 p. 48: 8-22], that Dr. Tooke did not make any referral to Mr. Allen's urologist or oncologist during the month of April [ECF 113 ex. 2 p. 48: 8-22], and did nothing to ensure Mr. Allen had access to Dr. Trojan [ECF 113 ex. 1 pp. 108:23-110:1. Further, Plaintiff provided the policies and procedures for the detention center which required Dr. Tooke to oversee Mr. Allen's chronic condition and arrange for all levels of his care, and provided evidence that those policies were not followed in Mr. Allen's case. Plaintiff has raised a triable issue of material fact that Dr. Tooke was deliberately indifferent to Mr. Allen's serious medical need. Dr. Tooke is not entitled to qualified immunity.

## CONCLUSION

**NOW, THEREFORE,** for the reasons discussed above, it is **ORDERED** Defendant Tooke's Motion for Summary Judgment on the basis of qualified immunity [ECF 103] is **DENIED.**

**IT IS FURTHER ORDERED** Plaintiff shall file an Amended Complaint amending the Constitutional Amendment under which this case is filed within fourteen (14) days of this order.

Dated this  19th  day of January, 2023.

Alan B. Johnson
United States District Judge